HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEFFERY WATSON,

                Plaintiff,

      v.

CITY OF VANCOUVER, et al.,

                Defendants.

ROBERT O'MEARA, GEOFFRY
GILLESPIE, and JAY ALIE,

                Counterclaimants,

      v.

JEFFERY WATSON and CHELSEE
OSBACK,

                Counterdefendants.

CASE NO. C13-5936 RBL

ORDER

[DKT. #S 68, 81, 79, AND 82]

## I. INTRODUCTION

THIS MATTER is before the Court on Defendant City of Vancouver's Motions for

Summary Judgment [Dkt. # 68] and for Partial Summary Judgment Re: Punitive Damages [Dkt.

# 81], Plaintiff Jeffery Watson's Motion for Partial Summary Judgment Against Defendant

1  Robert O'Meara [Dkt. # 79], and Counterdefendants Jeffery Watson and Chelsee Osback's Motion

2  for Summary Judgment [Dkt. # 82].

3       On June 18, 2011, Vancouver Police Department received a 911 call about a domestic

4  disturbance at Watson and Osback's apartment.  Officers (and Defendants) Gillespie, O'Meara,

5  and Alie responded to the call and arrested Watson at his apartment.

6       Watson and Osback sued the City and the three officers, alleging that the officers arrested

7  Watson unlawfully and with excessive force, in violation of their constitutional rights.  They

8  asserted a variety of § 1983 claims, Americans with Disabilities Act claims, and state law

9  claims[1].  Officers O'Meara, Gillespie, and Alie brought a malicious prosecution counterclaim

10 against Watson and Osback.

11      Four motions are pending before this Court.  First, the City seeks summary judgment on

12 Watson's remaining claims: his Fourth Amendment claims, his First Amendment claim, his

13 *Monell* claim, and his Title II ADA claim.  [Dkt. #68].  Generally, the Defendants argue that a

14 lack of evidence and lack of clearly established law entitle each individual officer to qualified

15 immunity, and that Watson's claims against the City are insufficient as a matter of law.  The City

16 also seeks partial summary judgment on Watson's punitive damages claim, arguing that there is

17 no evidence that the officers had the evil motive or intent required for Watson to claim punitive

18 damages.  [Dkt. # 81].

19      Watson seeks partial summary judgment on his illegal entry and his unreasonable use of

20 force claims against O'Meara.  [Dkt. # 79].  Watson argues that O'Meara entered his home

21 without a warrant or consent, and that the emergency exception did not apply.  Watson also

22 _____

23      [1] Watson's state law claims have been dismissed [Dkt. #20] and Osback is no longer a
   plaintiff in this case, although the officers' malicious prosecution counterclaim against her

24 remains. [Dkt. #37].

1  argues that O'Meara used unreasonable force against him as a matter of law.  [Dkt. #79 at 14].

2  Finally, Watson and Osback seek summary judgment on the officers' malicious prosecution

3  counterclaim, arguing that no reasonable jury could find that they sued with malice, or without

4  probable cause.  [Dkt. 82].  The Motions are addressed in turn.

5                                    **II. BACKGROUND**

6          Shortly before 1:00 a.m. on June 18, 2011, the resident of the apartment next to Watson's,

7  Lisa Davis, called 911 about a domestic disturbance in the Watson's apartment.  Davis reported

8  that a male was yelling, a female was screaming, and things were being broken.  A Vancouver

9  Police dispatcher sent a message reading: "MALE VS. FEMALE SOUNDS PHYSICAL LOTS

10  OF THINGS BREAKING AC." "AC" stands for "area check."

11         The parties' accounts differ greatly at this point.  The officers claim that O'Meara arrived

12  first, and could hear the disturbance from Watson's apartment.  O'Meara says he knocked on the

13  door and Watson opened it, wearing nothing but boxer shorts and appearing agitated and angry,

14  with Osback standing behind him crying and in distress.  O'Meara asked Watson to step outside,

15  and Watson replied "fuck you" and tried to slam the door shut.  O'Meara then kicked the door open

16  and grabbed Watson's arm to escort him outside.  According to O'Meara, Watson became "actively

17  resistive," leading O'Meara to pull Watson to the ground in an attempt to handcuff him.  O'Meara

18  says he gave Watson a "tap" to the back of the head with his flashlight, in an attempt to distract

19  Watson momentarily, so that he could apply the handcuffs.

20         Officer Gillespie recounts that he saw Watson try to slam the door in O'Meara's face and

21  ran upstairs to assist.  By the time Gillespie entered the apartment, the flashlight strike had

22  already occurred and Watson was bleeding from the back of the head.  Gillespie helped O'Meara

23

24

1    handcuff Watson.  Around this time, Osback told the officers that Watson had post-traumatic

2    stress disorder ("PTSD").

3        Watson's version is entirely different.  He claims he and Osback heard a knock on the

4    door and that he went to answer.  As he began to turn the lock he looked back to see if Osback

5    was dressed, and the door burst open.  Watson says he "did not have time to blink or breathe" when

6    someone grabbed him by his throat and face, and another person grabbed his body, and together

7    they began smashing his face and body into the furniture.  Watson claims O'Meara hit him in the

8    head twice with a flashlight; once on the back of his head, and once on the top.

9        Sergeant Alie reports that he arrived about the time O'Meara and Gillespie handcuffed

10   Watson.  Alie claims that Watson tried to spit on him as he escorted Watson outside.  Watson

11   denies spitting or attempting to spit on any of the officers.  He does admit that he tried to expel

12   plastic shards, debris, and blood from his mouth and airway.  The officers escorted Watson to the

13   parking lot and turned him over to the paramedics.

14       No charges were initially filed against Watson.  Six months after the incident, the

15   prosecuting attorney charged Watson with malicious mischief, obstructing an officer, and

16   attempted third degree assault for trying to spit blood on the officers.  The prosecutor eventually

17   decided only to charge Watson with attempted assault against Sergeant Alie.  The state court

18   granted Watson's motion for acquittal and denied the City's motion to reopen the case.

19       Watson and Osback sued the City and its officers, alleging that the officers arrested

20   Watson unlawfully and with excessive force, in violation of their constitutional rights.  They

21   asserted a variety of § 1983 claims, ADA claims, and state law claims for assault, false arrest,

22   and loss of consortium.  The City's answer included a malicious prosecution counterclaim against

23   Watson and Osback.

24

1    Some of Watson claims have already been dismissed, including state law claims for

2  negligence, negligent infliction of emotional distress, and *respondeat superior*.  [Dkt. #20; Dkt.

3  #31].  Osback's claims were dismissed in July, 2014.  [Dkt. #43].

4    The City now seeks summary judgment on all of Watson's claims: (1) his Fourth

5  Amendment claim against O'Meara and Gillespie for arresting him without probable cause; (2)

6  his Fourth Amendment excessive force claim against O'Meara and Gillespie; (3) his Fourth

7  Amendment unlawful entry claim against O'Meara, Gillespie, and Alie; (4) his malicious

8  prosecution claim against O'Meara, Gillespie, and Alie; (5) his First Amendment retaliation

9  claims against O'Meara and Gillespie; (6) his *Monell* no policy and failure to train claims against

10 the City of Vancouver; and (7) his Title II ADA wrongful arrest claim against the City.  [Dkt.

11 #68].  The City argues that Watson cannot establish that its officers violated any of his

12 constitutional rights, and even if he could, the officers are entitled to qualified immunity.  It also

13 argues that Watson's *Monell* and ADA claims against the City are insufficient as a matter of law

14 because Watson has not shown that the City had a deliberately indifferent policy for handling the

15 mentally ill or was deliberately indifferent in training its officers for *Monell* liability, nor

16 evidence that Watson's behaviors at the time of his arrest were due to PTSD for ADA liability.

17 The City also seeks summary judgment on Watson's punitive damages claim.  [Dkt. # 81].

18    For his part, Watson seeks partial summary judgment against O'Meara on his unlawful

19 entry and excessive force claims.  [Dkt. # 79].  He argues that O'Meara entered his home without

20 a warrant or consent, and that the emergency exception did not apply.  Watson also argues that

21 O'Meara's use of a Maglite flashlight on his head constituted unreasonable force as a matter of

22 law, and that the "governmental interests" factors did not support O'Meara's use of force.

23

24

1    Finally, Watson and Osback seek summary judgment on the malicious prosecution

2    counterclaim. They argue that a reasonable jury could not find they brought their claims with

3    malice or without probable cause.  [Dkt. 82].  The Motions are addressed in turn.

### III. DISCUSSION

**A.    Summary Judgment Standard.**

6    Summary judgment is appropriate when, viewing the facts in the light most favorable to

7    the nonmoving party, there is no genuine issue of material fact which would preclude summary

8    judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to

9    summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to

10   interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial."

11   *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence

12   in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D*

13   *Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the

14   outcome of the suit are irrelevant to the consideration of a motion for summary judgment.

15   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment

16   should be granted where the nonmoving party fails to offer evidence from which a reasonable

17   [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**B.    Qualified Immunity Standard.**

19   Qualified immunity "shields an officer from suit when she makes a decision that, even if

20   constitutionally deficient, reasonably misapprehends the law governing the circumstances she

21   confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  The Supreme Court has endorsed a

22   two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts

23   that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right

24   at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v.*

*Callahan*, 553 U.S. 223, 232 (2009)[2].  A government official's conduct violates clearly

established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are]

sufficiently clear' that every 'reasonable official would have understood that what he is doing

violates that right.'" *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quoting *Anderson v.*

*Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034 (1987)).  A case directly on point is not required,

"but existing precedent must have placed the statutory or constitutional question beyond debate."

*Id.*  (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, (1986)).  Qualified immunity

protects officers not just from liability, but from suit: "it is effectively lost if a case is erroneously

permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in

litigation." *Anderson*, 483 U.S. at 640 n.2.  The purpose of qualified immunity is "to recognize

that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to

make difficult decisions in challenging situations, thus disrupting the effective performance of

their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  Because "it is inevitable

that law enforcement officials will in some cases reasonably but mistakenly conclude that

probable cause [to arrest] is present," qualified immunity protects officials "who act in ways they

reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir.

2011) (quoting *Anderson*, 483 U.S. at 641) (bracket added).

       Even if the officer's decision is constitutionally deficient, qualified immunity shields him

from suit if his misapprehension about the law applicable to the circumstances was reasonable.

*Brosseau*, 543 U.S. at 198 (2004).  Qualified immunity "gives ample room for mistaken

---

[2] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier v. Katz*, 533
U.S. 194, 121 S.Ct. 2151 (2001) requiring district courts to decide each question in order.

1   judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224, 229,

2   112 S.Ct. 534 (1991).

3   **C.   Factual issues preclude summary judgment on Watson's excessive force claim, but summary judgment is granted on Watson's remaining claims.**

4   The City and its individual officers argue that Watson's version of the facts cannot be

5   reconciled with the medical records and evidence.  They argue that even if the officers' conduct

6   was not constitutional, they are entitled to qualified immunity.  They also argue that Watson's

7   claims against the City fail as a matter of law: his *Monell* claim is fatally flawed because the City

8   does have policies on how its officers are to handle the mentally ill, and it trains them in doing

9   so.  It claims it has policies and training on the use of force, and argues that Watson cannot

10   demonstrate that it was deliberately indifferent in doing so.  It seeks dismissal of the ADA claim

11   because Watson cannot establish that any effect of his PTSD was "misperceived" as criminal

12   activity.

13   **1.   Whether the officers' use of force was reasonable is a question of fact.**

14   Watson claims that O'Meara and Gillespie used excessive force against him by "brutally"

15   beating him and striking him with the flashlight.  The officers argue that neither Gillespie nor

16   O'Meara used excessive force against Watson, because Gillespie did not use any force against

17   Watson that caused injury and O'Meara's use of force with the flashlight caused minimal injury.

18   Even if the force used was not reasonable, they argue, both officers are entitled to qualified

19   immunity.

20   Watson argues that O'Meara and Gillespie entered his apartment at the same time and

21   took him to the floor immediately.  Watson claims that both officers struck him, and that O'Meara

22   hit him in the head twice, very hard, with his flashlight.  According to Watson, the governmental

23   interests at stake did not justify O'Meara's use of force because the only crime being investigated

24

1   was a misdemeanor domestic violence, because Watson did not pose an immediate threat to

2   anyone, and because he was not actively resisting the officers.  Watson argues that O'Meara's use

3   of force with the flashlight was unreasonable as a matter of law, and that Gillespie was an

4   integral part of the "attack."

5        Under the Fourth Amendment, a police officer may only use such force as is "objectively

6   reasonable" under all of the circumstances.  *Scott v. Harris,* 550 U.S. 372, 383, 127 S.Ct. 1769,

7   167 L.Ed.2d 686 (2007).  The reasonableness inquiry is "whether the officers' actions are

8   'objectively reasonable' in light of the facts and circumstances confronting them, without regard to

9   their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The

10  reasonableness of a particular use of force must be judged from the perspective of a reasonable

11  officer on the scene and not with the 20/20 vision of hindsight.  *Deorle v. Rutherford,* 272 F.3d

12  1272, 1279 (9th Cir. 2001) (citing *Graham,* 490 U.S. at 396).

13       To determine whether an officer used excessive force, the nature and quality of the

14  intrusion must be weighed against the countervailing governmental interest in the use of force.

15  *Id.*  That evaluation must be based on all of the circumstances known to the officer on the scene.

16  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  Important considerations include (1)

17  the severity of the crime or situation that the officer was responding to; (2) whether the plaintiff

18  posed an immediate threat to the safety of the officer or others; (3) whether the plaintiff was

19  actively resisting arrest or attempting to evade arrest by flight; (4) the amount of time and any

20  changing circumstances during which the officer had to determine the type and amount of force

21  that appeared to be necessary; and (5) the availability of alternative methods to subdue the

22  plaintiff.  *Id.*; *Graham*, 490 U.S. at 397.  The most important factor is whether the plaintiff posed

23  an immediate threat to the safety of the officers or others.  *Mattos v. Agarano*, 661 F.3d 433, 441

24

1    (9th Cir. 2011) (en banc).  The reasonableness of an officer's use of force is highly fact-

2    dependent, so parties are rarely entitled to summary judgment on the merits of an excessive force

3    claim.  *Smith*, 394 F.3d at 701; *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012)

4    ("Because the excessive force inquiry nearly always requires a jury to sift through disputed factual

5    contentions, and to draw inferences therefrom, we have held on many occasions that summary

6    judgment or judgment as a matter of law in excessive force cases should be granted sparingly."

7    (quoting *Glenn v. Washington Cnty.,* 673 F.3d 864, 871 (9th Cir.2011) (brackets and internal

8    quotation marks omitted))).

9          As is often true in excessive force cases, Watson's excessive force claim presents

10   questions of fact for trial.  *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007)

11   (summary judgment on excessive force claims "should be granted sparingly...because such cases

12   almost always turn on a jury's credibility determinations." (citation omitted)).  Both parties detail

13   out their own intricate versions of the facts in their respective pleadings and dispute which

14   officers hit Watson, where, and how many times.

15         For the same reason, the officers are not entitled to qualified immunity on this claim; it is

16   clearly established that the use of excessive force is unconstitutional.  The Defendants' Motion

17   for summary judgment on Watson's excessive force claim is DENIED[3].

18                    **2.    The officers are entitled to qualified immunity on Watson's unlawful
                           arrest claim.**
19
           Watson claims that O'Meara and Gillespie arrested him without probable cause.  The
20
     officers argue that they were responding to a domestic disturbance call, and that when O'Meara
21
     arrived he heard a female calling for help and ruckus inside the apartment.  Thus from the
22

23   ───────────────────
     [3] Because the reasonableness of the use of force is a question of fact, Watson's reciprocal
24   Motion for summary judgment on this issue is similarly DENIED.

perspective of a reasonable officer on the scene, the officers had a "fair probability" to believe that a crime was being committed inside, such as assault, attempted assault, harassment, or malicious mischief.  At minimum, the officers had reasonable suspicion to believe criminal activity was occurring, giving them constitutional authority to detain Watson.  The officers argue that there was probable cause to believe Watson committed *a* crime, making his arrest constitutional.  At best, the officers assert, probable cause was debatable, and Watson shows no case law that clearly established as of the incident that the officers did not have lawful authority to detain him in the circumstances they faced, entitling both officers to qualified immunity.

Watson's version of the incident is wholly at odds with the officers'.  He claims that he was attacked and taken to the ground as soon as he opened the door, and that the officers never talked to him or told him what they thought he may have done.  Watson claims there was no basis for his arrest.  He maintains that once it was clear that Osback was unharmed and Watson was suffering from a mental illness, the officers should have left.  Watson denies that he resisted, because he did not even know he was being arrested.  He also denies spitting on or at the officers, but claims that he was instead merely trying to clear the blood and debris from his mouth.which, of course, could look a lot like "spitting."

The officers reply that they had probable cause to believe Watson committed any number of crimes other than the one he was ultimately charged for, meaning his unlawful arrest cause of action fails.  Further, they argue that Osback denying she was injured does not create a duty to leave without further investigation.  They also argue that they are entitled to qualified immunity because probable cause was at least "arguably" present.

If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may arrest the individual without violating the Fourth

1   Amendment.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L.

2   Ed. 2d 549 (2001).  Probable cause to arrest exists if "the facts and circumstances within [the

3   officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to

4   warrant a prudent man in believing that [the plaintiff] had committed or was committing an

5   offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).  Police must show

6   only that "under the totality of the circumstances, a prudent person would have concluded that

7   there was a 'fair probability' that [the suspect] had committed a crime." *Hart v. Parks*, 450 F.3d

8   1059, 1066 (9th Cir. 2006) (citations and internal quotations omitted, alteration in original).

9        Even if O'Meara and Gillespie did not have probable cause to arrest Watson (a dubious

10   proposition), they are nevertheless entitled to qualified immunity.

11        The officers were responding to a domestic disturbance call.  Watson's claim that because

12   Osback was not physically injured the officers were constitutionally required to leave without

13   further investigation is simply wrong.  The officers claim that the disturbance was ongoing when

14   they arrived, that the female (Osback) was calling for help, and the apartment was in disarray,

15   giving them a reasonable suspicion to believe a crime was being committed and the authority to

16   detain Watson.  Even under Watson's version of the incident, the scene at the apartment was

17   chaotic: items were scattered about, Osback was worried about Watson hurting himself, and

18   Watson was, he claimed, suffering from a PTSD flashback.  At the very worst, O'Meara and

19   Gillespie reasonably but mistakenly believed that they had probable cause to arrest Watson.

20   Even in that case, they are entitled to qualified immunity as a matter of law.  *See Hunter v.

21   Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534 (1991) (Qualified immunity "gives ample room for

22   mistaken judgments" and protects "all but the plainly incompetent.").  The Defendants' Motion for

23   summary judgment on Watson's unlawful arrest claim is GRANTED.

24

### 3.   The officers' warrantless entry into Watson's home meets the emergency doctrine exception.

Watson claims that O'Meara, Gillespie, and Alie unlawfully entered his apartment, in violation of the Fourth Amendment.  O'Meara argues he was justified in entering the apartment under the "emergency aid exception" to the warrant requirement, because he was responding to a domestic disturbance complaint that sounded physical, and when he arrived he heard a female crying and screaming "Please don't hurt me."  Further, Gillespie and Alie argue that they had authority to enter because it was not "clearly established" then (or now) that an officer could not enter an apartment under these circumstances, or that a second officer could not follow.

Watson argues that O'Meara had no reasonable basis for believing that an imminent threat of injury existed, because O'Meara did not hear fighting or items breaking, nor see that a woman had been harmed.  Watson claims that he and Osback were calm before the officers arrived and that Osback did not say "please help me," but was instead telling Watson not to hurt himself.

O'Meara argues, correctly, that even Osback saying "please don't hurt *yourself*," would give an officer an objective basis to believe an occupant was in danger and needed help, making entry permissible under the emergency aid exception.

Under the emergency aid exception to the warrant requirement, officers may enter a home without a warrant when they have "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 400, 126 S. Ct. 1943, 1945, 164 L. Ed. 2d 650 (2006).  The emergency exception has three requirements: (1) The officers must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property, (2) the search must not be primarily motivated by intent to arrest and seize evidence, and (3) there must be some reasonable basis, approximating probable cause, to

1     associate the emergency with the area or place to be searched.  *United States v. Martinez*, 406

2     F.3d 1160, 1164 (9th Cir. 2005).  The "volatility of situations involving domestic violence make

3     them particularly well-suited for an application of the emergency doctrine." *Id.*   Officers do not

4     need "ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid

5     exception." *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S. Ct. 546, 549, 175 L. Ed. 2d 410 (2009).

6     The test is whether there was an "objectively reasonable basis" for believing an occupant was in

7     danger.  *Id.*

8             The officers' entry into Watson's home falls within the emergency doctrine exception to

9     the warrant requirement as a matter of law.  When O'Meara arrived at the apartment he was

10    responding to a reported domestic disturbance described as male vs. female and sounding

11    physical.  Based on the information known to him, O'Meara had an "objectively reasonable basis"

12    for believing that an occupant was in danger.  Gillespie responded to this same dispatch message,

13    and Alie was radioed by Gillespie for assistance.  Despite Watson's arguments that no domestic

14    violence had occurred and that Osback was uninjured, officers do not need "ironclad proof" of a

15    serious injury to justify the exception.  *Michigan*, 558 U.S. at 49.  Domestic violence situations

16    are serious and officers have a duty to investigate possible domestic violence incidents.  The

17    officers' warrantless entry into Watson's home falls within the emergency doctrine exception.

18            At the very most, the officers made a reasonable mistake that an emergency existed, and

19    they are nevertheless entitled to qualified immunity.  *See Hunter v. Bryant*, 502 U.S. 224, 229,

20    112 S.Ct. 534 (1991) (Qualified immunity "gives ample room for mistaken judgments" and

21    protects "all but the plainly incompetent.").  The Defendants' Motion for summary judgment on

22    Watson's unlawful entry claim is GRANTED.

23            Watson's reciprocal Motion for summary judgment on this claim is therefore DENIED.

24

### 4. Watson cannot show that the officers prosecuted him with malice.

Watson sued all three officers for malicious prosecution, claiming that they caused and maintained a prosecution against him, depriving him of his Fourth Amendment rights.  The officers argue that Watson's actions in front of them sufficiently established probable cause to believe he had committed a crime, and that Watson has provided no evidence of malice or intent to deny him equal protection or any other constitutional right.

Watson argues that because the officers lacked probable cause to arrest him, malice may be inferred.  Watson argues that the officers could not have believed him to be guilty of any crime, and their police reports were false and created solely to cause the prosecutor to file charges against him.  Watson claims that Osback filed a complaint with the Justice Department about the incident on the very same day that the prosecutor signed the statement of probable cause against Watson.  The Defendants point out that there is no evidence whatsoever that the prosecutor knew about Osback's DOJ complaint before filing charges against Watson—indeed there is still no real evidence that such a complaint was filed, at all, much less that the prosecutor ever saw it.

To succeed on a  malicious prosecution claim, a plaintiff must show that "the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir.1995)).

The burden of proof on the elements of a malicious prosecution action rests upon the plaintiff.  The burden of proof on malice remains on the plaintiff and is not shifted to the defendant even by proof of want of probable cause.  *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wash. 2d 485, 498, 125 P.2d 681, 688 (1942).  In some cases when the evidence establishes

1  want of probable cause, malice may be inferred, but this is "not a necessary deduction which must

2  invariably be made." *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wash. 2d 485, 498, 125 P.2d

3  681, 688 (1942).  It is not enough for a plaintiff to successfully establish a want of probable

4  cause, he must establish *malice* on the part of the defendant, "for want of probable cause without

5  malice is of no avail." *Id.* at 499.  That certain charges were dismissed "does not mean that [they]

6  were] not supported by probable cause." *Freeman*, 68 F.3d at 1189.

7       The malice requirement may be satisfied by proving that the prosecution complained of

8  was "undertaken from improper or wrongful motives or in reckless disregard of the rights of the

9  plaintiff." *Peasley*, 13 Wash. 2d at 502.  Improper motive may be established by proof that the

10  defendant instituted the criminal proceedings against the plaintiff: (1) without believing him to

11  be guilty, (2) primarily because of hostility or ill will toward him, or (3) for the purpose of

12  obtaining a private advantage as against him.  *Id.*

13       Watson has not shown how the City prosecuted him without probable cause or that they

14  did so with malice.  Viewed in the light most favorable to him, the evidence raises an issue of

15  fact as to whether probable cause existed for his arrest.  However, even if probable cause did not

16  exist for his arrest, Watson still has not established malice.  *See Peasley*, 13 Wash. 2d at 499

17  ("want of probable cause without malice is of no avail.").  Watson does not show that the criminal

18  proceedings were instituted without the prosecutor believing him to be guilty of assault, or that

19  they were instituted because of hostility or ill will toward him.

20       Watson makes only an unsupported assertion that the police reports were false and

21  created solely to get the prosecutor to file charges against him.  Watson also has not provided

22  any evidence to show that the prosecutor knew about Osback's complaint to the DOJ to support

23  his claim that the City only prosecuted him because he complained.  Watson does not show a

24

genuine issue of material fact as to whether anyone initiated the prosecution against him based on a wrongful motive or in a reckless disregard of his rights.  The Defendants' Motion for summary judgment on Watson's malicious prosecution claim is GRANTED.

      **5.**    **Watson has not shown retaliation for his speech, and he actually has to change his own factual account to make such a claim.**

Watson alleges that O'Meara and Gillespie retaliated against him (by arresting him) when he refused to allow them into his home and told them to leave, and violated his First Amendment rights by detaining, arresting, and physically assaulting him for refusing them entry.  The officers deny they violated Watson's First Amendment rights by retaliating against him.  They argue that as of the incident, there was no clearly established First Amendment right to be free from an arrest supported by probable cause, and thus the officers are entitled to qualified immunity.  The constitutional protection against warrantless searches is under the Fourth Amendment, not the First.

Watson argues that the officers assaulted him in retaliation for his efforts to close the door and because he said "fuck you" to an officer who asked him to step outside.  Watson asserts that cursing at an officer does not provide probable cause for an arrest, nor justify hitting someone with a flashlight.  Watson also argues that he was arrested and prosecuted because he told the officers he would be contacting internal affairs and the Justice Department to complain about how the police treated him.  Watson argues that qualified immunity is not available because any reasonably well-trained officer would know that retaliatory police activity is unlawful and violates the First Amendment.

The officers' point out that by Watson's own account, he did not speak before O'Meara began arresting him, meaning that O'Meara's actions could not be in "retaliation" for speech that never happened.  Or, if Watson accepts O'Meara's factual account, the law was not clearly

established as of the incident that an arrest which *was* supported by probable cause could violate the First Amendment.

The First Amendment protects verbal criticism, challenges, and profanity directed at officers "unless the speech is 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *United States v. Poocha*, 259 F.3d 1077, 1080 (9th Cir. 2001) (quoting *City of Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). Officers may not punish individuals for conduct that is protected by the First Amendment. *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.").

To demonstrate a First Amendment violation, a plaintiff must show that the defendant's actions deterred or chilled the plaintiff's speech and that such deterrence was a substantial or motivating factor in the defendant's conduct. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916 (9th Cir. 2012). Courts consider whether the official's conduct would chill or silence a person of "ordinary firmness" from future First Amendment activities. *Id.* Watson must allege facts "ultimately enabling him to 'prove the elements of retaliatory animus as the cause of injury," with causation being but-for causation. *Id.* at 917 (quoting *Hartman v. Moore,* 547 U.S. 250, 260, 126 S.Ct. 1695 (2006)).

Watson does not present any evidence to support his claim that he was retaliated against for cursing at Officer O'Meara. To make his retaliation claim, Watson actually has to change his version of the facts. Watson generally maintains that he did not have time to "speak or breathe" before O'Meara and Gillespie began beating him, unprovoked. Yet in his First Amendment cause

of action, he claims he said "fuck you" to O'Meara at the door, and in retaliation for that, he was assaulted and arrested.

Watson's bare and inconsistent assertion that he cursed at the officers is not enough to support a claim that he was arrested and prosecuted against *because of* his words (and not for any of the other reasons identified by the Defendants). Watson points to no evidence to support his theory that he was arrested and prosecuted because he vocally proclaimed he would be contacting internal affairs and the Justice Department to complain about how the police treated him. There is no evidence that the prosecuting attorney's later decision to prosecute him for assault was in any way related to comments he may have made to the officers during the incident, and not for other actions such as spitting blood and debris.

Furthermore, and in any event, the law was not then (or now) clearly established that an arrest made with probable cause could violate the First Amendment. The officers are entitled to qualified immunity from this claim as a matter of law. The Defendants' Motion for summary judgment for the City on Watson's First Amendment claim is GRANTED.

### 6. Watson has not presented evidence to support his *Monell* claims against the City under either his "no policy" or "failure to train" theories.

Watson asserts *Monell* claims against the City, arguing that it unconstitutionally has "no policy" regarding handling the mentally ill, and that the City inadequately trains its officers in what type and amount of information is sufficient to create probable cause for warrantless arrests and seizures. He claims that the City's "policy" was the moving force behind the constitutional violations he claims to have suffered. [Dkt. #12, ¶¶38-49].

The City argues, and demonstrates, that it *does* have policies on handling the mentally ill and on the use of force. Further, it argues that Watson has not shown that these policies were adopted with "deliberate indifference" to the constitutional rights of Vancouver citizens. The City

1    also argues that Watson cannot demonstrate the City's deliberate indifference in how it trained its

2    officers because he has not shown a pattern of similar constitutional violations by untrained

3    employees.

4        Watson responds that if the City had required its officers to undergo Crisis Intervention

5    Training, they would have deescalated the situation with Watson.  He also argues that the

6    officers had not been trained to recognize the difference between a crime and someone having a

7    PTSD flashback[4].  He argues that the City does not prohibit its officers from deploying blows to

8    the head with blunt instruments as a distraction technique, a 'policy' that allowed officers to use

9    large Maglite flashlights as impact weapons and 'emboldened and ratified' O'Meara's conduct, and

10   that the City cleared O'Meara of any wrongdoing.

11       The City points out that O'Meara *did* receive Crisis Intervention Training.  It also argues

12   that Watson does not show that it had notice that its use of force policy was deficient such that

13   reliance on it would constitute deliberate indifference.  Further, the City argues that internal

14   affairs investigated O'Meara before clearing him of any wrongdoing.

15       A municipality cannot be held liable under § 1983 on a theory of *respondeat superior*.

16   *Monell v. Dept. of Soc. Servs. Of City of N.Y.*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978).  For a

17   local governmental entity to be liable under § 1983, a plaintiff must show that "action pursuant to

18   official municipal policy" caused [his or her] injury." *Connick v. Thompson*, 131 S.Ct. 1350, 1359

19   (2011) (quoting *Monell*, 436 U.S. at 691).  In this context, "official policy" includes a government's

20   lawmakers' decisions, its policymaking officials' acts, and practices so persistent and widespread

21   that they constitute standard operating procedure.  *Id.*

22

23       _____

     [4] Watson does not address the obvious fact that one could be having a PTSD flashback

24   and still "commit a crime."

A governmental entity's decision not to train its employees in a particular respect may rise to the level of an official governmental policy for *Monell* liability, in limited circumstances. *Id.* To impose § 1983 liability, a municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989)). Deliberate indifference is a stringent standard. *Id.* at 1360. It requires proof that the municipality disregarded a known or obvious consequence of its action or inaction. *Id.* Thus, a municipality can only be liable for failure to adequately train its employees if it had actual or constructive notice that its training program would cause its employees to violate citizens' constitutional rights. *Id.* Ordinarily, a plaintiff must show a pattern of similar constitutional violations by untrained employees to establish deliberate indifference for purposes of failure to train. *Id.*

Watson's "no policy" argument is unsupported—the City has shown that it does have policies regarding both the mentally ill and the use of force. Watson's "failure to train" claim similarly fails. Watson's claims that if the City had required officers undergo Crisis Intervention Training they would have deescalated the situation with Watson, but ignores the fact that O'Meara *did* receive such training. There is no evidence showing a pattern of similar constitutional violations by the Vancouver police, and Watson has not established that the City was on notice that its use of force policy would cause one of its employees to violate a citizen's constitutional rights. Finally, investigating O'Meara and clearing him of wrongdoing does not show that the City "ratified" O'Meara's actions. *See Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir.) *cert. granted sub nom. City & Cnty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 702, 190 L. Ed. 2d 434 (2014) ("The mere failure to discipline [an employee] does not amount to ratification of their allegedly unconstitutional action." (bracket added)). If failure to discipline were enough

1   for ratification, then if the City determined that there was a constitutional violation, the officer

2   would be liable, but if it determined there was no violation, the City would be liable.  This is not

3   the law.  Watson's assertion that O'Meara was not adequately trained is pure speculation, and his

4   failure-to-train *Monell* claim fails as a matter of law.

5       The City's Motion for summary judgment on Watson's *Monell* claims is GRANTED.

### 7.    Watson has not shown that the officers misperceived the effects of his PTSD sufficient to support his ADA claim.

7   Watson's remaining claim is under the ADA.  He claims that the officers arrested him for

8   conduct that was a manifestation of his mental illness, and not a criminal act[5].  The issue is

9   whether City officers wrongfully arrested Watson because they misperceived the effects of his

10  disability as criminal activity.

11      The City argues that Watson cannot present evidence to demonstrate that his behaviors

12  when he first encountered the police were the effects of his PTSD.  Watson argues that it is

13  'undisputed' that the officers knew of his disability when they encountered him.  Watson also

14  argues that the officers discriminated against him by 'failing to provide a reasonable

15  accommodation by arresting and prosecuting him for manifestations of his mental illness'[6].  The

16  City responds that no one mentioned Watson's PTSD until O'Meara and Gillespie were attempting

17  to handcuff Watson.

18      Courts have found that a Title II ADA claim could lie where 'police wrongly arrested

19  someone with a disability because they misperceived the effects of that disability as criminal

20  _____

21      [5] Obviously, the two are not mutually exclusive.  A person could commit a crime due to
    the effects of their PTSD.  It might support a 'not guilty by reason of insanity' defense, but that

22  does not mean that an officer cannot intervene when a PTSD sufferer is committing what would
    otherwise be a plain vanilla assault.

23      [6] Watson's reasonable accommodation ADA claim has already been dismissed.  [Dkt.
    #20, 25].  The Court will assume, despite Watson's word choice, that he intends this argument to

24  apply to his remaining ADA claim that the officers misperceived the effects of his PTSD.

1  activity." *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999); *see also Patrice v. Murphy*,

2  43 F. Supp 2d 1156, 1160 (W.D.Wash.1999) (noting the potential of the claim, but holding that

3  the plaintiff had expressly declined to make such a claim); *Sheehan*, 743 F.3d at 1232 (noting

4  that courts have recognized at least two types of Title II claims applicable to arrests, including

5  the wrongful arrest because of misperceived effects claim).

6       Even viewed in the light most favorable to him, the evidence does not support Watson's

7  claim that the officers arrested him because they misperceived the effects of his PTSD.  By

8  Watson's account, he was calm when the officers arrived and was attacked for no reason and

9  before he could speak.  Watson does not point to any PTSD behaviors that occurred between

10  when the officers arrived and when they left that were allegedly misperceived.  That Watson had

11  a PTSD episode before the officers arrived is not evidence that the officers misperceived the

12  effects of his PTSD as criminal activity *when they encountered him*.  Indeed, his claim is that

13  they attacked him instantly, without provocation; he does not even claim that he had a PTSD

14  event while they were there.

15       The Defendants' Motion for summary judgment on Watson's ADA claim is GRANTED.

16      **D.**    **The Availability of Punitive Damages can be addressed at trial.**

17       The question of whether Watson could be entitled to punitive damages can be decided at

18  the end of trial rather than on summary judgment.  The Court cannot determine as a matter of

19  law that Watson is not entitled to punitive damages at this stage of the case.  The issue can be

20  addressed in the Court's instructions to the jury if the evidence at trial does not support such a

21  claim.  The Defendants' Motion for summary judgment on Watson's punitive damages claim is

22  DENIED.

23

24

1   **E.      Watson had probable cause to bring his action, which is a complete defense**
2   **to the officer's malicious prosecution counterclaim.**

O'Meara, Gillespie, and Alie assert a malicious prosecution counterclaim against Watson

3   and Osback.  The officers argue that Watson and Osback filed their lawsuit knowing that it

4   contained multiple falsehoods, and with the knowledge that their action was false, unfounded,

5   malicious, and without probable cause.

6          Watson and Osback seek summary judgment and argue that there is no way a jury could

7   conclude that Watson brought his claims with malice and without probable cause.  The

8   Defendants argue that Osback and Watson knew that the incident was Watson's fault and cannot

9   claim to 'reasonably believe' the factual account on which they based their lawsuit, and thus a jury

10  may infer that Watson and Osback lacked probable cause to initiate their lawsuit.  As such, the

11  City argues, a jury may also reasonably infer that Watson and Osback filed their lawsuit in

12  reckless disregard for the officer's rights, which is enough to prove malice and proceed to trial on

13  the counterclaim.

14         Watson and Osback argue that Watson had probable cause to bring his action, and the

15  officers have no evidence of malice or ill will on Watson or Osback's part, nor evidence that they

16  brought knowingly false claims for a wrongful purpose.  Instead, Watson argues, the officers

17  have only pointed to allegedly invalid factual allegations, and have not shown that one or more

18  of Watson's *causes of action* were improperly filed.

19         A defendant may assert a malicious prosecution counterclaim under RCW 4.24.350

20  requires that based on an 'action,' not merely on a factual allegation.  *Brin v. Stutzman*, 89 Wash.

21  App. 809, 819, 951 P.2d 291, 297-98 (1998).  To succeed on a malicious prosecution

22  counterclaim, the officers must prove that (1) Watson instituted or maintained a malicious

23  prosecution, (2) Watson lacked probable cause to do so, (3) Watson acted with malice, and (4)

24

the officers suffered injury or damages as a result. *Ostrander v. Madsen*, No. 00-35506, 2003

WL 193565, at *2 (9th Cir. Jan. 28, 2003) (citing *Hanson v. Estelle,* 100 Wash.App. 281, 997

P.2d 426, 430 (Wash.Ct.App.2000). Probable cause is a complete defense to an action for

malicious prosecution, thus if probable cause is established, the action fails. *Hanson v. City of*

*Snohomish*, 121 Wash. 2d 552, 558, 852 P.2d 295, 298 (1993). A plaintiff has probable cause to

maintain an action if there are legitimate issues requiring resolution in the trial court. *Ostrander*

*v. Madsen*, No. 00-35506, 2003 WL 193565, at *2 (9th Cir. Jan. 28, 2003) (citing *Hanson,* 100

Wash.App. 281 (no genuine issue of material fact as to probable cause where Ostrander

presented the district court with the legitimate issue of whether the officers used excessive force,

so officers did not have basis for malicious prosecution counterclaim).

There are questions of fact left to resolve at trial on Watson's excessive force claim.

These questions of fact indicate that there was probable cause for Watson to bring and maintain

his action

Watson and Osback's Motion for summary judgment on the Defendants' malicious

prosecution counterclaim against them is GRANTED.

### IV. CONCLUSION

The City's Motion for Summary Judgment [Dkt. #68] is GRANTED IN PART and

DENIED IN PART.

The City's Motion for Summary Judgment Re: Punitive Damages [Dkt. #81] is DENIED.

Watson's Motion for Partial Summary Judgment Against Defendant Robert O'Meara [Dkt.

# 79] is DENIED.

1    Counterdefendants' Motion for Summary Judgment [Dkt. #82] is GRANTED.

2    IT IS SO ORDERED.

3

4    Dated this 12th day of March, 2015.

5

6    RONALD B. LEIGHTON
7    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24